UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| ALUMINUM RECOVERY | ) | |
| TECHNOLOGIES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NUMBER: 1:17 CV 383 |
| | ) | |
| ACE AMERICAN INSURANCE CO. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiff, Aluminum Recovery Technologies, Inc., ("ART") is dissatisfied with the insurance recovery it received from its insurer, ACE American Insurance Co. ("ACE") after ART suffered a loss from a furnace failure that released molten aluminum into ART's Kendallville, Indiana plant. As a result, ART filed the present suit seeking a declaratory judgment as to its rights and obligations under the Policy as well as separate counts alleging breach of contract, negligence, and bad faith. Presently before the Court is ACE's Motion for Summary Judgment [DE 24]. For the following reasons, the Motion will be GRANTED in part and DENIED in part. The parties are encouraged to conduct settlement negotiations on the remaining claims and report to the Court prior to the Court's scheduling the case further.

## APPLICABLE STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The movant bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of designated evidence that demonstrate the absence of a

1

genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.' " *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

## **FACTUAL BACKGROUND**

The following facts are largely undisputed. However, where in dispute, the evidence is presented, as it must be at this stage, in the light most favorable to the non-movant.

ART is an Indiana corporation with its principal place of business in Kendallville, Indiana. [DE 1, at ¶1]. ACE is a Pennsylvania domiciled insurance company authorized to issue property and casualty insurance policies in Indiana. *Id.* at ¶2. ART and ACE were parties to a contract of property insurance under policy no. EPRN0 915 8765 for the policy period of March 1, 2015 to March 1, 2016 ("the Policy"). A complete copy of the Policy has been filed in the record as DE 25-1.

In January, 2016, ART completed a construction project to expand the size and capacity of furnace #4 at its Kendallville, Indiana plant ("the Kendallville plant"). On February 8, 2016, while furnace #4 was being loaded for the first time after completion of that project, its containment was lost and it had a breakout whereby molten aluminum escaped through a crack in the furnace wall and leaked onto the factory floor in the Kendallville plant.

I.     **Amounts Paid Pursuant to the Policy and Relevant Policy Provisions**

Pursuant to the terms of the Policy, ACE paid ART $264,562.00 for the covered property damage loss sustained as a result of the failure of furnace #4. This amount reflected a total property damage loss of $274,562.00, less a $10,000.00 property damage deductible. This amount is not disputed by the parties.

In addition, ACE paid ART $173,878.00 for extra expense incurred as a result of the failure of furnace #4, extra expenses totaling $232,284.00 – less a deductible of $58,946.00 which was based upon 10 times the plant's daily value of production. ART asserts that this amount is not the full amount due to it under the Policy and that ACE also owes it for property damage to the refractory lining. Specifically, ART asserts: (1) ACE has not reimbursed it for all the extra operating expenses compensable under the Policy; (2) ACE has not reimbursed it for the property damage to furnace #4 refractory lining; and (3) ACE was negligent and acted in bad faith during its investigation of the cause of the breakout.

The Policy contains numerous endorsement provisions relevant to this case including an endorsement provision for business interruption and extra expense coverage:

**COMBINED BUSINESS INTERRUPTION AND
EXTRA EXPENSE INSURANCE ENDORSEMENT**

A.     **AMOUNT OF INSURANCE:** …

1. Against loss directly resulting from necessary interruption of the Insured's business and the consequent reduction in *Gross Earnings*, caused by damage to or destruction of real or personal property covered under this Policy … by the peril(s) insured against during the term of this Policy;

2. Against loss directly resulting from necessary *Extra Expense,* as hereinafter defined, incurred by the Insured in order to continue as nearly as practicable the normal operation and normal Gross Earnings of the Insured's business following damage to or destruction of real or personal property covered under this Policy by the peril(s) insured against during the term of this Policy;

…

**B.  COVERAGE:**

Subject to all terms, conditions and stipulation of the Policy to which this endorsement is attached, not in conflict herewith, this Policy is extended to insure against loss resulting directly from:

1. Necessary interruption of the Insured's business and the consequent reduction in *Gross Earnings* caused by damage to or destruction of real or personal property …;

2. Necessary *Extra Expense, as hereinafter defined,* incurred by the Insured in order to continue as nearly as practicable the normal operation and normal *Gross Earnings* of the Insured's business following damage to or destruction of real or personal property;

by the peril(s) insured against during the term of this Policy, which property is on premises occupied by the Insured and situated as herein described.

**C.  MEASURE OF RECOVERY:**

In the event of such damage or destruction, this Company shall be liable for:

A. The ACTUAL LOSS SUSTAINED by the Insured resulting directly from such interruption of business, but not exceeding the reduction in *Gross Earnings* less charges and expenses which do not necessarily continue during the interruption of business (*hereinafter referred to as* **"Loss of Earnings");**

B. Such NECESSARY EXTRA EXPENSE incurred by the Insured;

for only such length of time … as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of termination of this Policy.

Applicable only to *Loss of Earnings*, due consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations of the Insured's business with the same quality of service which existed immediately preceding the date of damage or destruction.

…

F. **GROSS EARNINGS:**

… "**Gross Earnings**" are defined as the sum of:

1. Total net sales value of production,

2. Total net sales of merchandise, and

3. Other earnings derived from operation of the business,

less the cost of:

4. Raw stock from which such production is derived,

5. Supplies consisting of materials consumed directly in the conversion of such raw stock into finished stock or in supplying the service(s) sold by the Insured,

6. Merchandise sold, including packaging materials therefor, and

7. Service(s) purchased from outsiders (not employees of the Insured) for resale which do not continue under contract.

No other costs shall be deducted in determining *Gross Earnings*. In determining *Gross Earnings* due consideration shall be given to the experience of the business before the date of damage or destruction and the probable experience thereafter had no loss occurred.

G. **EXTRA EXPENSE**

The term "**Extra Expense**," … is defined as the excess (if any) of the cost(s) incurred during the period of restoration, chargeable to the operation of the

> Insured's business, over and above the cost(s) that would normally have been incurred to conduct the business during the same period had no destruction occurred. Any salvage value of property obtained for temporary use during the period of restoration, which remains after the resumption of normal operations, shall be taken into consideration in the adjustment of any loss hereunder.

[DE 25-1, at pp. 51-52].

The Policy also contains numerous exclusions, including a refractory exclusion provision as follows:

> PROPERTY EXCLUDED:
>
> This Policy does not cover:
>
> r.    Any refractory lining or catalyst, except for damage or destruction directly resulting from the perils of fire, lightning, windstorm, hail, explosion…

[DE 25-1, at pp. 28-29].

## II.    The Loss and Subsequent Events

As discussed at the outset, on the morning of February 8, 2016, furnace #4 at the Kendallville plant failed causing molten aluminum to pour onto the factory floor. Donald Mosely ("Mosely"), a supervisor for ART, was on the floor working at the time of the furnace failure. He testified that shortly before the molten aluminum was noted on the factory floor, there was an explosion in the furnace. (Deposition of Donald Mosely [DE 27-1], at pp. 11-12, hereafter "Mosely Dep. at ___.") ART Plant Manager, Farrell Norman ("Norman"), also testified that his "understanding" was that "we had an explosion in the furnace prior to the break-out and that's what initiated it." (Deposition of Farrell Norman [DE 27-2] at pp. 37-38, hereafter, "Norman Dep. at ___.")[1] Norman, however, has no personal knowledge of the alleged explosion; rather he only has knowledge of what he was told by others.

---

[1] Norman did not experience the explosion first hand. He testified that he learned about the explosion because Mosley told "another guy" and that guy told him. While this testimony seems to constitute

6

ACE was notified of the furnace failure and began its investigation. As part of the investigation, ACE retained mechanical engineer Francisco Godoy ("Godoy"), of Engineering Systems, Inc., to investigate the root cause of the failure of furnace #4. Interested parties were invited to participate in the root cause investigation including the contractors involved in the furnace #4 expansion project which had completed 10 days prior to the furnace #4 failure. (Deposition of Francisco Godoy, [DE 25-12], Exhibit 1, hereafter "Godoy Dep. at __."). Godoy prepared a protocol for an initial visual, non-destructive inspection of furnace #4 that was circulated to all parties interested in the investigation, including ART's representative.[2] During this initial inspection, Godoy and the other parties involved, including ART's representative, discussed and agreed to the destructive testing that would take place on the second day of the root cause investigation. In particular, ART's representative acquiesced to ACE's request to remove the refractory. At the time of his acquiescence, ART's representative was unaware of the Policy exclusion for replacement of the refractory.

Based on the discussions above, Godoy prepared and circulated a protocol for the second day of the root cause investigation to all interested parties, The protocol for the second day of the investigation contained a drawing identifying areas inside furnace #4 from which samples would be taken and was signed by representative of all interested parties, including ART's representative. [DE 25-12]. As a result of this protocol, portions of the refractory in the area of the break-out were removed. Eventually, ART had to replace the refractory lining that was removed as a result of Godoy's protocol and it is this cost that it is seeking from ACE.

---

textbook hearsay as an out of court statement made by a declarant *if* offered for the truth of the matter asserted, no objection has been made to this testimony. However, it does not appear that the testimony is offered as "proof" that an explosion occurred but rather to demonstrate that he believed an explosion occurred.

[2] It's unclear who ART's representative was in this root cause investigation. There is a suggestion in the briefs that it may have been Norman as the Plant Manager, but that is not at all clear.

Subsequently, ART submitted a claim, prepared by Thomas Marchioni ("Marchioni"), an employee of Metropolitan Alloys and the financial controller for ART, for extra expenses totaling $406,597.00. (Deposition of Thomas Marchioni [DE 25-2] at 41, hereafter "Marchioni Dep. at ___). Marchioni prepared the extra expense claim by taking a monthly average of variable expenses incurred in 2015 and comparing the 2015 monthly average variable expenses to the variable expenses incurred while furnace #4 was being repaired in 2016. (Marchioni Dep. at 31). Marchioni testified that the extra expense claim he prepared and submitted to ACE also included the value of production and sales that were lost as a result of the failure of furnace #4. (*Id.* at pp. 45-48). ART informed ACE's adjuster that it did not sustain a business interruption loss as a result of the failure of furnace #4. (*Id.* at p. 57; Q: "As discussed in our March 13, 2017 and April 10, 2017 letters to ART, ART previously advised us that there was no loss of business income during the period of restoration. Is that statement accurate?" A: Yes.")

On April 10, 2017, ACE's adjuster, Michael Eyster ("Eyster"), sent ART a letter outlining ACE's evaluation of the extra expense claim. [DE 25-4]. Enclosed with the letter were schedules explaining ACE's evaluation of Plaintiff's extra expense claim. Those schedules were prepared by Meaden & Moore, an accounting firm retained by ACE to evaluate ART's extra expense claim. As part of its evaluation, ACE denied ART $334,330 reimbursement for the cost of replacing the refractory lining (and disposing of the removed refractory lining) for furnace #4 and also denied it $46,810 for the tear-out of the refractory material done at the direction of ACE's engineers while investigating the cause of the furnace failure.[3] The basis of the denial of these expenses was the exclusion in the Policy for damage to refractory lining. [DE 25-1, at pp. 28-29]. Additionally, ACE adjusted some of the extra expenses for direct labor and electricity.

---

[3]Eyster calculated the deductible to be $58,946. The deductible calculation is not in dispute.

On May 11, 2017, counsel for ART responded to Eyster's letter disputing ACE's evaluation of ART's extra expense claim for direct labor, electricity, and ACE's conclusion that there was no coverage for the refractory lining of furnace #4. [DE 25-5]. On May 25, 2017, Eyster replied to ART's letter and acknowledged ACE's position that there was coverage for $173,878.00 net of the Policy deductible of $58,946.00. [DE 25-6]. Eyster persisted in ACE's position that no additional expenses for direct labor, electricity or replacement of the refractory lining would be authorized. ART did not respond to this letter.

On August 21, 2017, Eyster sent a follow-up letter to ART's counsel. ART did not respond to this letter either and instead, filed the present suit on September 9, 2017.

At no time prior to the initiation of this litigation, did ART disclose to anyone at ACE that an explosion had occurred prior to the furnace failure. Rather, the first time ACE learned that an explosion occurred was on April 13, 2018 when ACE received interrogatories in this suit. Other than the testimony of Mosely and Norman, ART has not disclosed any expert or opinion testimony to support its claim that the loss to the refractory lining was caused by an explosion. Likewise, despite making a claim that ACE, through Godoy, negligently removed too much refractory in the course of their root cause investigation thereby causing them additional damage, ART has not provided any expert testimony to call that decision into question.

## DISCUSSION

ART seeks a declaratory judgment as to certain aspects of the Policy and has also brought claims against ACE for breach of contract, negligence and bad faith. The parties do not dispute that ACE has provided coverage under the Policy for the physical property damage caused to the plant and some of the extra expenses incurred by ART from the loss. However, ART contends it is owed additional sums. The Court will address each of these remaining claims below.

## I. Breach of Contract and Request for Declaratory Judgment

The Court begins first with the claim for breach of contract, which in turn, also informs ART's request for a declaration as to its rights and obligations under the Policy. In Indiana[4], "[t]he interpretation of an insurance policy is primarily a question of law for the court, and it is therefore a question which is particularly suited for summary judgment." *Wagner v. Yates,* 912 N.E.2d 805, 808 (Ind. 2009) (citation omitted). In an insurance policy dispute under Indiana law, "the insured has the burden of proving that the coverage applies, and the insurer, if relying on an exclusion to deny coverage, has the burden of demonstrating that the exclusion is applicable." *Bowman, Heintz, Boscia & Vician, P.C. v. Valiant Ins. Co.*, 35 F.Supp.3d 1015, 1023 (N.D. Ind. 2014) (citation omitted). "Generally speaking, contracts for insurance are subject to the same rules of construction as other contracts." *Id.* "[C]lear and unambiguous language in an insurance policy should be given its plain and ordinary meaning, even if those terms limit an insurer's liability." *Everett Cash Mut. Ins. Co. v. Taylor,* 926 N.E.2d 1008, 1012 (Ind. 2010) (internal citation omitted). "If the terms of a written contract are ambiguous, it is the responsibility of the trier-of-fact to ascertain the facts necessary to construe the contract." *Newnam Mfg., Inc. v. Transcon. Ins. Co.,* 871 N.E.2d 396, 401 (Ind. Ct. App. 2007). Where policy language is ambiguous, Indiana courts generally construe it strictly against the insurer and in favor of the insured. *Taylor,* 926 N.E.2d at 1012 (citation omitted). Because an insurance policy is a contract for insurance, it is governed by the same rules of construction as other contracts. *Briles v. Wausau Ins. Cos.,* 858 N.E.2d 208, 213 (Ind.Ct.App.2006) (citing *Gregg v. Cooper,* 812 N.E.2d 210, 215 (Ind.Ct.App.2004).

### A. ART'S Claim for Additional Reimbursement under the Extra Expense Endorsement

---

[4] The parties do not dispute that Indiana law controls this dispute under the principles of the *Erie* doctrine. *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).

As with any insurance coverage dispute, the starting point of the analysis is the language of the Policy. The provisions relevant to this first claim matriculate from the Combined Business Interruption and Extra Expense Insurance Endorsement in the Policy. Before turning to these specific provisions though, the Court must first whittle down the scope of ART's claim under this endorsement. In its brief, ACE spends much time addressing whether ART has made a business interruption claim under the endorsement. However, ART clearly states in its brief that it is not seeking reimbursement for business interruption. Rather, it states that it "is instead seeking its extra expense incurred due to the increased cost of production during the period furnace #4 was out of service for repair." (Response brief at p. 15, ¶49). Because of this concession, the Court shall not address any hypothetical claim by ART for business interruption.[5]

With the scope of the dispute clarified, the Court turns to the specific coverage provisions. Under the endorsement, insurance coverage exists (within certain limits of liability, see DE 25-1, at p. 53 ¶H) "[a]gainst loss directly resulting from necessary *Extra Expense ...* incurred by the Insured in order to continue as nearly as practicable the normal operation and normal Gross Earnings of the Insured's business" [DE 25-1 at p. 51 ¶A(2) and ¶B(2)]. The measure of recovery for this type of loss is "[s]uch NECESSARY EXTRA EXPENSE incurred by the Insured" and is limited in time to the "period of restoration." The term "Extra Expense" is a term of art defined in the endorsement as "the excess (if any) of the costs incurred during the period of restoration, chargeable to the operation of the Insured's business, over and above the cost(s) that would

---

[5] The briefs in this case are, to say the least, odd and in a format that is unusual in this Court. For instance, in ACE's brief its Statement of Material Facts and its argument section are divided into individual numbered paragraphs. In its response brief, ART, as it would in an Answer to a Complaint, admits, denies or admits/denies in part each numerical paragraph. Until ACE's reply, neither side presents its discussion arguments in a traditional briefing format. This unusual briefing formulation has made this case exceedingly more difficult for the Court to parse through the arguments and understand the parties' positions.

normally have been incurred to conduct the business during the same period had no damage or destruction occurred." [DE 25-1, at p. 53, ¶G].

ART asserts that it is entitled to additional Extra Expense coverage that it has not received for items outlined in controller Marchioni's claim submission to ACE. ART contends that the explanation of ART's loss in Marchioni's submission and his deposition testimony is sufficient to raise a genuine issue of material fact as to whether ACE properly calculated the Extra Expenses due to ART under the endorsement. In response, ACE makes a curious assertion that Marchioni's testimony is not admissible because "his calculation of Plaintiff's purported extra expense claim was not made in accordance with the [P]olicy provisions." (ACE Summary Judgment brief at p. 12, ¶50). This assertion is a curious one in that ACE does not provide any elaboration or detail in its brief as to how Marchioni's testimony and submission to ACE for reimbursement failed to comply with any provision of the Policy. The Court surmises from ART's response brief that ACE objects to Marchioni's use of historical costs and production amounts to demonstrate the increased per pound cost of production or extra expenses it incurred. However, ACE does not explain how this calculation does not comport with the Policy nor does it provide any legal support for the assertion that this alone makes his testimony inadmissible. Indeed, ACE's failure to agree with the calculation does not *ipso facto* make the calculation non-compliant with the Policy.

Additionally, ACE does appear to suggest that ART was required to disclose Marchioni as an expert witness if it intends to have him testify about the claim submission he made to ACE. However, that is simply incorrect. Under Fed. R. Evid. 701 a non-expert witness may offer "opinion[s] ... not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed.R.Evid. 701(c). The advisory committee notes to Rule 701 explain that "most courts have permitted the owner or officer of a business to testify to the value or projected profits

of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert." Fed.R.Evid. 701 advisory committee notes. As controller for ART, Marchioni has first-hand knowledge and expertise in performing the accounting and cost functions of ART. For this reason alone, he may testify as a lay witness to explain the calculations he made for the Extra Expense submission. *See Ryan Dev. Co. v. Indiana Lumbermens Mutual Ins. Co.,* 711 F.3d 1165-1170 (10th Cir. 2013) (approving testimony of accountant as to company's lost profits under Rule 701 where the accountant prepares such valuations on personal experience with the company, uses basic math, and no outside expert reports.). *See also, First Annapolis Bancorp, Inc. v. United States,* 72 Fed.Cl. 204, 207 (2006) ("[A] lay witness accountant may testify on the basis of facts or data perceived in his role as an accountant based on his personal knowledge of the company."); *Teen–Ed, Inc. v. Kimball Int'l, Inc.,* 620 F.2d 399, 402–04 (3d Cir.1980) (admitting lay opinion testimony by an accountant concerning lost profits).

Despite its initial position, in its reply brief ACE seems to fall away from its position that Marchioni must be qualified as an expert stating that "ACE does not dispute that, with the proper evidentiary foundation … Marchioni could testify to the extra expense loss." (Reply, at p. 2). However, ACE then reverts to the argument discussed previously that "Marchioni did not calculate Plaintiff's purported extra expense claim in accordance with the terms of the insurance policy." For this reason, ACE continues by asserting, his testimony is therefore inadmissible.

ACE cites not a single legal authority in support of this assertion nor does it point to any provision in the Policy with which it contends Marchioni's submission did not comply. Further, while it claims that ART has "conceded" that Marchioni did not calculate the Extra Expense claim properly, from what the Court can gather, it did nothing of the sort. Moreover, all of ACE's contentions as to whether the Extra Expense calculations are proper can be addressed at trial by

way of cross-examination of Marchioni. As a result, the Court DENIES ACE's Motion for Summary Judgment as to additional amounts that may be owed to ART under the Extra Expense endorsement.

### B. ART'S Claim for Reimbursement for the Furnace Refractory Lining

Next, ART asserts that is entitled to coverage for the replacement of the furnace refractory lining. In response, ACE asserts that the furnace refractory lining is expressly excluded from coverage under the Policy exclusion that states, "This Policy does not cover: …r. Any refractory lining or catalyst …" [DE 25-1, at p. 29, ¶r]. ART, in turn, notes that the exclusion contains an exception for "damage or destruction directly resulting from the perils of … explosion." *Id.* ART goes on to note that Mosely and Norman have both provided testimony that an explosion occurred prior to the furnace failure. As a result, it contends there is a genuine issue of material fact as to whether the exclusion applies.

As discussed above, in the case of an exclusion, the burden rests with the insurer to demonstrate that a potentially covered loss falls within the exclusion. Indeed, "[i]t is well settled law that a condition or exclusion in an insurance policy must clearly and unmistakably bring within its scope the particular act or omission that will bring the condition or exclusion into play in order to be effective, and coverage will not be excluded or destroyed by an exclusion or condition unless such clarity exists." *Asbury v. Indiana Union Mut. Ins. Co.*, 441 N.E.2d 232, 241 (Ind. Ct. App. 1982).

To support its burden, ACE simply points to the exclusion provision itself and states that ART admits that its "claim for damages to the Furnace #4 refractory lining falls within the general exclusion for refractory lining found in the [P]olicy." (Response Brief, at p. 17, ¶54). It is true that ART admits this fact; however, ART goes on to assert that there is an exception to the exclusion

14

for damage caused by explosion which, in turn, reinstates coverage. ART contends that it has met its burden of demonstrating the exception applies by producing testimony from two witnesses that calls into question whether an explosion occurred immediately prior to the furnace failure.[6]

Unfortunately for ART, the testimony that an explosion occurred, even when accepted as true for summary judgment purpose, does not, by itself, demonstrate that an explosion *caused* the damage to the refractory lining. ART has not presented any witness, expert or otherwise, that has provided this connection between the explosion heard by Mosely and reported to Norman to the damage to the refractory lining.

What ART has done, is attempt to create confusion by presenting testimony from William G. Sale ("Sale"),[7] the owner of K Industrial, the company who removed the lining on behalf of Godoy. In his deposition, Sale testified generally that "an explosion 'could have'" precipitated the failure of furnace #4. However, ART attempts to rely on Sale's expertise and degree in Ceramic Engineering as well as the fact that he has opined previously on 10-12 refractory failures to support his opinion in this case. This appears to be a clear attempt to designate him as a witness with specialized expertise pursuant to Fed.R.Evid. 702. Yet, ART has not disclosed him previously as an expert witness to testify in this case, see Fed.R.Civ.P. 26(a)(2)(c)(1), nor has it provided an expert report, as is required. As a result, the Court is barred from considering his statements of what "could have" occurred.

---

[6] The parties also spend much time disputing whether ART had an obligation to disclose to ACE during its investigation that Mosely stated he heard an explosion or whether ACE had a duty to interview Mosely and inquire about what had occurred. This is much ado about nothing in the grand scheme of things because, as evidenced in the body of the order, ART has not met its burden of showing causation, that is, that an explosion caused any damage to the furnace #4 refractory lining.

[7] Sale's opinion appears to come out of nowhere in the briefs. It is not mentioned at all in ACE's Brief in Support of its Motion and ART does not mention him at all until p. 18 of its response brief.

Even more confounding is that ART also makes a negligence claim (addressed more fully below) that the refractory lining was damaged by its removal by ACE's investigator. ART cannot have it both ways: it cannot assert that an explosion damaged the refractory lining and recover under the terms of the Policy AND assert that ACE's negligent investigation caused damage to the refractory lining. Simply put, ART has not raised a genuine issue of material fact that the explosion exception to the exclusion applies here. For all these reasons, ACE's Motion for Summary Judgment as to whether coverage is excluded for the refractory lining is GRANTED.

## II. Negligence

Next, ART seeks to hold ACE liable for negligence in its handling of the root cause investigation. Specifically, ART asserts that during Godoy's investigation, Godoy called for the removal of "too much" furnace refractory lining thereby causing ART damage to the refractory that ACE knew was not reimbursable due to the Policy exclusion.

To withstand summary judgment on a claim of negligence, ART must establish a genuine issue of material fact that: (1) ACE owed a duty to ART; (2) ACE breached that duty by allowing its conduct to fall below the applicable standard of care; and (3) ACE's breach of duty proximately caused a compensable injury to ART. *Rhodes v. Wright*, 805 N.E.2d 382, 385 (Ind. 2004).

Once again, the Court is confounded by the parties' arguments and the briefs. The premise underlying ART's claim is two-fold: first, it asserts that ACE had a duty to inform ART that the refractory lining was excluded from Policy coverage before it removed it; and second, that Godoy authorized "too much" furnace refractory lining to be removed.

Beginning first with ART's assertion that ACE had a duty to inform ART of the refractory lining exclusion, this is incorrect. An insured has a duty to read and become familiar with the contents of an insurance policy. *National Mut. Ins. Co. v. Curtis,* 867 N.E.2d 631, 635

16

(Ind.Ct.App.2007). A different scenario arises if an insured relies upon the representation of the insurer that a particular loss is covered, as reasonable reliance upon an agent's representations as to what will be covered under a policy can override the insured's duty to read the policy. *Filip v. Block*, 879 N.E.2d 1076, 1084 (Ind.2008) (citing *Village Furniture, Inc. v. Associated Ins. Managers, Inc.,* 541 N.E.2d 306, 308 (Ind.Ct.App.1989), *trans. denied* ). But that is not what is alleged here. Thus, it is unclear what duty of care ART asserts ACE breached.

As for whether "too much" refractory was removed, ART has presented absolutely <u>no evidence</u>, no lay testimony and no expert evidence from which any reasonable juror could find this fact to be true. There is not a shred of evidence presented to the Court that raises a genuine issue of material fact that Godoy, mind you with the acquiescence of ART's own representatives, removed too little, much less too much, of the furnace refractory lining to complete its investigation. This said, ART simply states, "[w]hether 'too much' refractory was removed during the root cause investigation is a factual question that the jury must decide." (Response, p. 20 at ¶60).[8] Unfortunately, saying it is a factual question requires "some facts" from which a jury could reasonably conclude in ART's favor. As ART has designated none, ACE's motion for summary judgment on the negligence claim is GRANTED.

### III. Bad Faith Claim

ART's final claim is that ACE has acted in bad faith as it relates to the coverage of its claim and the manner in which ACE conducted its investigation. "Indiana law has long recognized that

---

[8] There are also a slew of red herring arguments in the briefs as to whether Godoy was an agent of ACE or an independent contractor. ACE asserts that Godoy was an independent contractor and thus, it cannot be held liable for Godoy's negligence. Regardless of Godoy's status, ART has not brought forth any evidence of breach of ANY duty by Godoy or anyone else and thus, the Court need not determine Godoy's status as an agent or independent contractor.

there is a legal duty implied in all insurance contracts that the insurer deal in good faith with its insured." *Erie Ins. Co. v. Hickman ex rel. Smith*, 622 N.E.2d 515, 518 (Ind. 1993).

> An insurance company's duty of good faith and fair dealing includes the obligation to refrain from: (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising an unfair advantage to pressure an insured into settlement of his claim. To prove bad faith, the plaintiff must establish by clear and convincing evidence that the insurer had knowledge that there was no legitimate basis for denying liability. Poor judgment or negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present. Thus, [a] finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will. *Missler v. State Farm Ins. Co.*, 41 N.E.3d 297, 302 (Ind. Ct. App. 2015) (citations and internal quotations omitted).

Pearman v. Stewart Title Guar. Co., 108 N.E.3d 342, 348 (Ind. Ct. App. 2018), reh'g denied (Sept. 11, 2018), transfer denied, 2019 WL 311111 (Ind. Jan. 17, 2019).

ACE has moved for summary judgment on this claim contending that there is no evidence to support the state of mind necessary for such a claim and that at all times ACE conducted itself appropriately. In support of its motion, ACE points out that it provided reasoned explanations for all of its decisions regarding coverage. Indeed, in May 2017, ACE detailed the bases for its evaluation of Plaintiff's extra expense claim and provided schedules outlining the bases for its evaluation. The undisputed evidence is that ART did not respond to letters from ACE in May nor did it respond to the follow up letter sent to it in August, 2017. Instead, it filed suit. At most, ACE asserts, this demonstrates that there was a bona fide dispute as to the extra expense claim which it was attempting to resolve with ART, to no avail. Thus, it asserts that it cannot be held liable for a bad faith claim.

This Court agrees. A good faith dispute about the amount of a valid claim or about whether the insured has a valid claim does not supply the grounds for a bad faith claim. *Hickman,* 622 N.E.2d at 520; *see also Monroe Guar.,* 829 N.E.2d at 976. "This is so even if it is ultimately

18

determined that the insurer breached its contract. That insurance companies may, in good faith, dispute claims, has long been the rule in Indiana." *Hickman,* 622 N.E.2d at 520. Here, with respect to the extra expense claim, there is simply no evidence of dishonest purpose or any other negative state of mind that would warrant a jury to conclude that ACE acted in bad faith.

Nevertheless, ART asserts that the focus of its bad faith claim is the manner in which ACE conducted its claims investigation. ART contends that ACE investigated in bad faith when it failed to explore the exception to the refractory exclusion, i.e., the explosion and when it destroyed a large portion of the refractory during the root cause investigation. Interestingly, however, all the parties agree that the fact that there *was* an explosion was never disclosed to ACE at the time of the investigation. Thus, it appears ART desires to hold ACE accountable for facts that ACE was not privy to at the time it investigated the furnace failure. It is undisputed in the record that ACE was not told until months *after* suit was filed that Mosely heard an explosion. Moreover, the evidence is also undisputed that ART (and other representatives of third parties) actively participated in a two-day on-site root cause investigation. ART acquiesced in the protocols suggested and at no time during this investigation made reference to any explosion which may have put ACE on notice to investigate further or differently. ART once again points to no piece or pieces of evidence which suggests that ACE intentionally ignored information, had a dishonest purpose, or had no rational, principled basis for concluding that the refractory exclusion applied. As a result, no reasonable jury could conclude that ACE acted in bad faith and ACE's Motion for Summary Judgment on this claim must be GRANTED.

## **CONCLUSION**

Based on the foregoing, ACE's Motion for Summary Judgment [DE 24] is GRANTED as to: (1) ART's breach of contract claim asserting coverage for the furnace refractory; (2) ART's

negligence claim related to the claim investigation; and (3) ART's claim for bad faith. The Motion is DENIED as to ART's claim for extra expenses under the Policy and its request for a declaratory judgment that it is entitled to such extra expenses. The parties shall conduct a settlement conference in the next thirty (30) days and report to the Court the results of that conference within seven (7) days thereafter. If the case has not settled, the Court will schedule a telephone status and scheduling conference by way of separate minute entry.

Entered: This 13th day of May, 2019.

s/ William C. Lee  
United States District Court